# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EDINTON GRUGBAY WRIGHT,<br><br>Defendant. | Case No. 25-cr-48-CJW<br><br>**ORDER RE: SCOPE OF CROSS-EXAMINATION**<br>**AND**<br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS AND MOTION TO DISMISS** |

_____

## TABLE OF CONTENTS

Page

I.    INTRODUCTION..................................................................3

II.   FINDINGS OF FACT............................................................4

    A.   *The events of October 21, 2023* ................................................ 4

    B.   *The investigation leading to the June 4, 2025 indictment* ................. 8

    C.   *Requests by Defendant and others on his behalf to obtain the return of the cell phone* ................................................................11

    D.   *The revocation proceedings in January 2024, arising in part because of the October 21, 2023 events* ................................................13

III.  THE SCOPE OF CROSS-EXAMINATION OF DEFENDANT ..................14

    A.   *The parties' arguments* ........................................................15

    B.   *Discussion* ........................................................................17

1

**IV.   THE MOTION TO SUPPRESS** ......................................................**28**

    **A.**    **The parties' arguments** ............................................**28**

    **B.**    **Relevant law** ..........................................................**29**

    **C.**    **Application** ..............................................................**36**

        **1.**    **Whether there was an illegal stop** .....................**36**

        **2.**    **Whether Defendant's Fifth Amendment rights were violated** .........................................................**37**

        **3.**    **Whether the cell phone was legally seized** ............**39**

        **4.**    **Whether delay in seeking a warrant rendered the search illegal** ...............................................**41**

        **5.**    **Whether there was an illegal search of the phone prior to the warrant** ................................**45**

        **6.**    **Whether Leon applies** .......................................**46**

**V.   THE MOTION TO DISMISS** ....................................................**49**

    **A.**    **The parties' arguments** ............................................**49**

    **B.**    **Relevant law** ..........................................................**50**

    **C.**    **Application** ..............................................................**51**

**VI.   CONCLUSION** ......................................................................**52**

    **A.**    **Order** .......................................................................**52**

    **B.**    **Report and Recommendation** ..................................**53**

# I.    INTRODUCTION

Defendant, a convicted felon, exited a car and fled from police. A firearm was found near the path he traveled, and his cell phone was seized from the car. The instant motions seek to suppress evidence and dismiss the firearm charge.

On June 4, 2025, the Grand Jury returned an Indictment charging Defendant with one count of Possession of a Firearm by a Felon in violation of 18 U.S.C. § 922(g)(1) and 924(a)(8). (Doc. 3.)

The matter before the Court is Defendant's Motion to Suppress and Motion to Dismiss. (Docs. 25, 26.) The Government timely filed responses. (Docs. 36, 39.) I held a hearing on September 2, 2025. (Doc. 41.) At the hearing the Government called three witnesses from the Cedar Rapids Police Department, Officer Austin Bailey, Task Force Officer John O'Brien, and Investigator Jeff Holst. The following Government exhibits[1] were admitted without objection:

1. Bodycam of Officer Austin Bailey

2. Bodycam of Officer Paul Cavin

3. Bodycam of Officer Cody Vry

4. Patrol car video of Officer Salena Watkins

5. Delay of Initial Appearance

6. Search Warrant and Affidavit (under seal)

7. CRPD Towing and Impound Policy

8. Vehicle Disposition Form

9. CRPD Record of Inquiry

10. Holst Phone Examination Record

11. Email chain dated January 2, 2024

---

[1] Defendant's Motion to Suppress refers to "Officer Bailey Narrative Report" which was not offered into evidence. (*See, e.g.*, Doc. 25 at 3.)

12. Emails

Defendant also testified. I found all the witnesses to be credible.[2]

## II. FINDINGS OF FACT

While the instant prosecution arises from the events of October 21, 2023, when Defendant ran from and was chased by law enforcement, the relevant facts stretch across at least two years and a series of related events.

a) The events of October 21, 2023, including Defendant's arrest and seizure of his cell phone;

b) The investigation leading to the June 4, 2025 indictment;

c) Requests by Defendant and others on his behalf to obtain the return of the cell phone; and

d) Defendant's prior federal conviction, especially the revocation proceedings in January 20, 2024, which arose in part because of the October 21, 2023 events.

## A. The events of October 21, 2023

At about 1:30 a.m. on October 21, 2023, Cedar Rapids Police Officers Austin Bailey and Paul Cavin were on patrol in a marked patrol vehicle when they noticed a black Cadillac SUV (the "SUV") travelling the opposite direction. When they noticed it had no front license plate, they made a U-turn to investigate a possible law violation under Iowa Code § 321.37(1).[3] As the officers turned around, the SUV abruptly turned right, jumped a curb, and stopped on the lawn of a residence. (Bailey Hr'g Test. at 7.)

---

[2] Regarding the Government's three witnesses, I simply find them credible. I note here that my credibility finding is very narrow with respect to Defendant on the limited subject of his testimony. The Government's desire to cross-examine Defendant about the events of October 21, 2023 is discussed below.

[3] In the event, the vehicle had a temporary registration tag. Ultimately, the Court need not decide whether there was any basis for a traffic stop because none occurred. I recommend the Court conclude that the driver of the SUV drove up on the lawn and stopped in response to the patrol car's U-turn, not because law enforcement attempt to make a traffic stop.

The driver and the passenger (later determined to be Defendant) fled the scene on foot, leaving the vehicle illegally parked with the doors open. (*Id*.) The officers parked and chased on foot. The paths of Defendant and the driver diverged, and Officer Bailey chased Defendant. Officer Bailey manually activated his body worn camera during the chase. This supports the conclusion that the officers had not initiated a traffic stop with their emergency lights because activating those lights would have also activated the officers' body worn cameras.

The chase proceeded across at least three backyards, over two fences, and across a street. After running through one backyard, Defendant and the driver split up at a fence. (*Id*. at 19.) While it was well after dark, Officer Bailey employed his flashlight and there appears to be some ambient light from nearby homes and streetlights.

Officer Bailey noticed Defendant running with an asymmetrical gait consistent with "pacing," that is, keeping one hand "pinned" at his waist rather than swinging freely. Officer Bailey believed this indicated Defendant was carrying a firearm or something in his "hand that was important." (*Id*. at 12-13.) [4] During the chase, Officer Bailey repeatedly commanded Defendant to stop and unsuccessfully deployed his taser. (*Id*. at 13-14.)

Eventually, Defendant surrendered. (*Id*. at 19; Ex. 1 at 01:37:58.) Officer Bailey asked for Defendant's name, and he provided it. (*Id*.; Ex. 1 at 1:39:32.) Officer Paul Cavin approached Officer Bailey after Defendant was in handcuffs and standing up, i.e., after Defendant had identified himself to Officer Bailey. (Ex. 2 at 1:39:43.) Defendant gave his name to Officer Cavin in response to an inquiry and asked about his wallet. (*Id*. at 1:39:43.)

---

[4] Hearing testimony is from the Court Reporter's rough draft of the transcript of the September 2, 2025 suppression hearing that was provided as a courtesy to the Court. An official transcript of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

5

After Defendant was in custody, Officer Bailey and Officer Cavin walked Defendant back to the curb in front of the house where he surrendered. About 15 or 20 feet from where Defendant had stopped, Officer Bailey located a black pistol. (Bailey Hr'g Test. at 19, 23, 24.) While walking Defendant back, Officer Bailey located the firearm and stated, "Oh. You dropped your gun, too." (*Id.* at 14; Ex. 1 at 01:40:14.) Defendant denied knowing about the gun. Defendant made multiple inquiries about his wallet. (*See, e.g.*, Ex. 1 at 01:40:50.) At Defendant's request Officer Cavin checked Defendant's back pocket for his wallet. (Ex. 2 at 1:40:54.) When asked again about his name, Defendant replied, "My name is in my wallet. I would love to speak to my attorney." (Ex. 1 at 01:41:25.)

Bailey: [Wallet] went flying with your gun?

Defendant: That's not me, sir.

(*Id.* at 1:42:57.)

Officer Bailey again asked for Defendant's name[5] at 1:43:52 of Exhibit 1 and Officer Cavin explains that he does not want to disclose it. Defendant stated, "I prefer to speak to my attorney." (Ex. 1 1:43:58.) Officer Bailey explained, "That's fine if you want to talk to your lawyer. I totally get that, but you're going to have to tell me who you are because you're going to jail." (*Id.* at 1:44:04.) Officer Bailey explained that running from the car is interference with official acts. (*Id.* at 1:44:11.) Defendant then began to ask questions about the meaning of the charge. (*Id.* at 1:44:13.) Officer Bailey explained that if Defendant did not disclose his name, he would wait in jail until he was identified. When Officer Bailey told Defendant he was charged with interference with official acts "with a firearm" Defendant denied he had a firearm. (*Id.* at 1:44:45.)

---

[5] The multiple requests for Defendant's name after he has already volunteered it are not puzzling in context. For example, both officers asked for his name immediately after the chase. They began to ask him again after they sat him on the curb and pulled out their notebooks.

Officer Bailey testified that he did not continue to question Defendant after he requested an attorney, except to verify his identity. (Bailey Hr'g Test. at 19.) Although Defendant had previously given his name, Officer Bailey continued to try to verify his identity. Defendant's wallet was found within the route of the foot chase. (*Id.*; Ex. 1 at 1:48:24.)

The driver of the vehicle was apprehended several blocks north of this location. (Bailey Hr'g Test. at 19.)

Officer Bailey determined Defendant was the passenger of the vehicle. Defendant was arrested. Because both occupants of the vehicle, Defendant and the driver, were arrested, the SUV was impounded and towed pursuant to departmental policy. (*Id.* at 15.) The policy provides in relevant part

> In-custody arrests of the driver where an impound is not warranted.
> o The owner/responsible party may release the vehicle to a licensed driver who can retrieve the vehicle within 30 minutes.
> o The driver requests the vehicle remain at the stop location.
> ▪ The vehicle must be legally parked on public property and not a hazard.
> ✓ Vehicles shall not be allowed to remain on private property without permission of a responsible person for that property.

(Ex. 7.) There was no connection between the occupants of the vehicle and the owner of the house who had asked for the vehicle to be removed. (O'Brien Hr'g Test. at 66.)

Defendant was placed in the back seat of Officer Selena Watkins's patrol car. (Ex. 4; O'Brien Hr'g Test. at 56.) After sitting in the vehicle for several minutes, Defendant initiated a conversation with Officer Watkins. (Ex. 4 at 10:50, 37:25.) He first asked if officers had found his wallet and then asked if she could talk to him about where he was going and about calling his "people." (*Id.* at 11:51.) Defendant asked if officers were "searching my vehicle." (*Id.* at 17:16.) Defendant asked whether officers had found his phone. (*Id.* at 20:13.) Defendant also initiated conversation with Officer Watkins about why he ran and other details of the encounter. (*See, e.g.*, *id.* at 25:00.) An officer opened the door and asked Defendant about vehicle insurance. Defendant said the information was on his cell phone in the car. He identified the phone as red. (*Id.* at

7

32:09.)  Defendant then asked the officer to tell him what he was being charged with. He asked Officer Watkins more questions about the charges and where he would be taken. (*Id.* at 37:55.)  Officer Watkins said she believed he would be charged with interference with official acts with a weapon.  (*Id.* at 37:01.) Defendant initiated discussion of fingerprinting the weapon and asked her multiple questions about the process.  He also volunteered that he was on "federal paper."  At 49:30, Defendant identified his wallet. I would characterize Officer Watkins's interaction with Defendant as her predominantly responding to Defendant's questions and attempting to be helpful about the process.

## B.     *The investigation leading to the June 4, 2025 indictment*

The Government called Officer John O'Brien from the CRPD.  Officer O'Brien is currently assigned as an FBI Safe Streets Task Force Officer.  He is a graduate of the Illinois State Police Academy and has ongoing training dating back 30 years.  Officer O'Brien was not present for the October 23, 2023 encounter but later became involved in the investigation and, among other things, reviewed the body camera video from Officer Bailey's partner, Officer Paul Cavin, as well as K-9 Officer Cody Vry.  (While not described as the "case agent," Officer O'Brien appears to fill that role.)

Officer O'Brien testified that Officer Vry was involved in the apprehension of the driver and then returned to conduct an open-air sniff of the vehicle with his trained narcotics detection dog.  After the dog alerted to the presence of a controlled substance, the SUV was searched and an open liquor bottle, paperwork, and cell phones[6] were recovered.  (O'Brien Hr'g Test. at 50.)  The red cell phone attributed to Defendant (and subsequently accessed by Inv. Holst) was found in the passenger door.  (*Id.*)

When asked to describe the evidentiary value of a cell phone in an investigation of a defendant's possible possession of a firearm, Officer O'Brien stated:

---

[6] Another phone found on the SUV's driver's side was attributed to the driver and it was not seized.

8

What I have found over the years is that cell phones, they're – they're a part of pretty much everybody's daily life. They're used for almost all forms of communication. And in going through cell phones, I find that, one, people like to take pictures of firearms. They like to take pictures of themselves with firearms. Phones are also used to potentially try to obtain a firearm. If someone is prohibited, they have to go through a third party that either can lawfully purchase a firearm and is willing to sell it to somebody or they ask friends a lot of times; Google searches for different types of firearms, what they might want to buy.

(*Id.* at 52.) When prompted, Officer O'Brien also described a second evidentiary purpose of a phone. Like any other personal property intimately tied to an individual, such as a wallet, the phone's physical presence would show the owner's proximity to the firearm. (*Id.* at 53.) Officer O'Brien testified that even without a search of the cell phone's contents, the phone itself had evidentiary value and law enforcement had an interest in holding it as evidence in the investigation. Officer O'Brien authored the search warrant for the cell phone shown in Exhibit 6. Prior to obtaining the search warrant he never had possession of the phone and never searched it, nor, to his knowledge, did anyone else. (*Id.* at 55.)

Officer O'Brien described the investigation and the timing of the search warrant. He described the FBI procedures as "very complicated and redundant." (*Id.* at 60.) Officer O'Brien testified:

[I]t's a gathering of information, starting with an ATF trace, a nexus statement, the gun has to be processed by the police department. A NIBIN statement was gathered that shows that this firearm was used in a shooting unrelated to this incident. It also shows who the original purchaser was. And then from there, you apply for the search warrant for DNA. That's usually my first go to, is DNA, just simply because of the backlog at the FBI laboratory. I know it does take a while, so I want to get that started immediately. So it's just a progression of steps.

(*Id.* at 60-61.)

9

Officer O'Brien testified there were positive results to the NIBIN examination[7] which compares shell casings to determine if a firearm would be tied to other shooting incidents. (*Id.* at 61.) These positive results created additional follow-up work for the investigation. (*Id.* at 63.) He also referenced the time it took to do a firearm trace summary to identify the original purchaser from a federally licensed firearms dealer, to obtain a nexus examination to determine if the firearm was manufactured outside of Iowa, to obtain a warrant for DNA, to photograph, swab and fingerprint the firearm, and bring a witness[8] before a grand jury. Officer O'Brien clarified that he is not required by FBI procedures to complete the nexus analysis, NIBIN search, and obtain DNA results[9] prior to applying for a warrant but it was logical to do so. (*Id.* at 78.) Officer O'Brien testified that he typically carries a caseload of 15 to 20 cases, with the highest priority being those with a violent offender on the street. (*Id.* at 64-65.) Defendant's case was a lower priority because he was in custody pending his revocation hearing. Prior to the issuance of the warrant shown in Exhibit 6, a state search warrant was authored. (*Id.* at 75.)

Officer O'Brien testified that he did not wait until February 8, 2024 to obtain a warrant because he believed there was no rush. (*Id.* at 65.) Officer O'Brien swore out the warrant remotely during his vacation.

---

[7] The NIBIN report was completed before Defendant's supervised release hearing. The incidents had all occurred while Defendant was in custody and there was no connection to Defendant. (O'Brien Hr'g Test. at 72-73.)

[8] The witness appears to have been the driver of the vehicle, Mr. Houston, who was not difficult to find. (O'Brien Hr'g Test at 73.)

[9] DNA testing was performed in this case to compare Defendant's DNA to any on the firearm. Law enforcement did not have DNA results before this Court issued a warrant on February 8, 2024. (O'Brien Hr'g Test. at 82.) The request for DNA testing was submitted on December 28, 2023 and the laboratory report was received on July 10, 2024. (*Id.* at 85.)

Investigator Jeff Holst of the CRPD is a certified forensic computer examiner who testified regarding the storage and search of the cell phone seized on October 21, 2023.[10] The purpose of calling Inv. Holst was apparently to establish the phone had not been accessed by law enforcement prior to the issuance of a warrant. Inv. Holst used GrayKey software and hardware to perform an extraction from Defendant's cell phone as shown in an extraction report. (Holst Hr'g Test. at 28; Ex. 10.) The extraction report indicates that the date of extraction, February 13, 2024, was the first time the phone had been opened and accessed since it came into police custody. The device was successfully accessed; however, it was not able to be accessed by the GrayKey "Bruteforce" feature and it was not accessed using a passcode.

Inv. Holst testified that because the phone is secured in the CRPD digital forensics lab, he would know if anyone had previously attempted to access the phone. He further testified that the cell phone came into his possession on October 23, 2023. (*Id.* at 43.) The cell phone remained on a charger so it would remain in the state as it was received. (*Id.* at 44.) The cell phone was released from the secure lab on July 17, 2024, presumably to other evidence storage at the CRPD. (*Id.* at 43.)

C.     *Requests by Defendant and others on his behalf to obtain the return of the cell phone*

Defendant bonded out of the Linn County Jail at about 5 a.m. on October 21, 2023. (Ex. 5.) Defendant was arrested on a federal warrant (presumably for a supervised release violation) on October 30, 2023. (O'Brien Hr'g Test. at 57.) Defendant remained in custody of the U.S. Marshals continuously until February 8, 2024, when the warrant to search the phone was issued. Defendant was housed in facilities that do not permit

---

[10] Inv. Holst has been with the CRPD for approximately 20 years. (Holst Hr'g Test. at 27.) He is currently assigned Internet Crimes Against Children Digital Forensic Lab. His duties include the extraction and examination of digital evidence from various electronic devices.

inmates to have cell phones. (*Id.* at 57-58.) Officer O'Brien testified regarding one contact Defendant made regarding his phone. Exhibit 10 is a record of the CRPD. Officer O'Brien explained that it shows that Defendant called the CRPD evidence section on April 10, 2025 requesting his phone back. (*Id.* at 59.) The record shows that Defendant "cannot have his phone. Obrien [sic] confirmed that the case was adopted Federally and the evidence needs to be retained." Officer O'Brien testified that had the police department been contacted before April 10, 2025 by Defendant or a family member, there would have been a similar note, but no such note exists. (*Id.* at 59-60.) Presumably the cell phone is still in the possession of the CRPD or the Government per Exhibit 9.

Officer O'Brien testified that if someone approached the CRPD front desk seeking return of a phone that was seized, that person would be referred to the evidence section. The front desk does not appear to have made any note of such an interaction. (*Id.* at 68, 84.)

Defendant testified regarding his efforts to obtain his cell phone back after he was released from jail beginning October 21, 2023. When he left the Linn County Jail on October 21, 2025, Defendant received his personal property back, but was told the jail did not have his cell phone. (Defendant Hr'g Test. at 89.) Defendant went to the CRPD vehicle division to inquire about the vehicle that was towed. He then went to the front desk to ask about his cell phone. Defendant testified he gave someone his case number and was told they did not have his cell phone in their custody. (*Id.* at 90.) Defendant testified this interaction would have occurred during normal business hours sometime between October 21 and 30, 2023, when he went back into custody. (*Id.* at 95.)

Defendant also testified that in April 2025 both he and his probation officer called the CRPD about the return of his phone after he was released from custody and at a halfway house after serving 24 months for the probation violation. (*Id.* at 100.)

Defendant also testified that his family members made an unspecified number of attempts to inquire about the return of his phone. (*Id.* at 102-103.)

On rebuttal, Officer O'Brien testified that, depending on when Defendant contacted the CRPD regarding his phone, it might not have been logged into evidence immediately, particularly after a busy weekend. (O'Brien Hr'g Test. at 105.) October 21, 2023 was a Saturday night and, therefore, the earliest it would be logged into evidence would have been Monday, October 23, 2023. (*Id.*) This sort of communication with the front desk would not be noted. (*Id.* at 106.)

**D.** **The revocation proceedings in January 2024, arising in part because of the October 21, 2023 events.**

Defendant previously pleaded guilty in this Court to being a drug user in possession of a firearm and was sentenced to 33 months' imprisonment. (19-CR-34-CJW-MAR, Doc. 43, 60.) Defendant's supervised release was first revoked in 2022.

On October 23, 2023, the USPO filed a Petition to Revoke Supervision and an arrest warrant was issued. (19-CR—34 Doc. 89.) Defendant was arrested on October 30, 2023. (19-CR-34 Doc. 91.) Defendant was alleged to have committed a new law violation (interference with official acts) and association with a felon/person engaged in criminal activity (i.e., the driver of the SUV.) (*Id.*) The violations arising out of the October 23, 2023 incidents described above were summarized as follows:

> On October 23, 2023, this officer received an incident report filed by the Cedar Rapids, Iowa, Police Department (CRPD), alleging the defendant committed the new law violation of Interference with Official Acts, in violation of Iowa Code 719.1(1)(B). According to CRPD report, on October 21, 2023, officers attempted to conduct a traffic stop on a vehicle the defendant was observed to be a passenger. Upon conducting the traffic stop, two (2) individuals, the defendant and Chris Houston, fled from the vehicle in different directions. Following a foot pursuit, the defendant was eventually apprehended by CRPD. Upon surveying the area, a firearm was located in close proximity to the defendant and the path officers observed

13

him to have taken while fleeing. According to the CRPD report, the defendant refused to identify himself when asked. The defendant's wallet was located by officers, and his identification confirmed. The located firearm was seized and has been forwarded for further investigation to determine whether the defendant had possessed the firearm. The other occupant and reported driver of the vehicle, Chris Houston, is a convicted felon. The defendant did not have permission to associate with Mr. Houston. Mr. Houston was also apprehended and charged with multiple new offenses (see attached Cedar Rapids Police report). (Violation #1c & #3).

Defendant admitted all violations against him except the new law violation of interference with official acts. (19-CR-34 Doc. 112.) Nevertheless, the Court found he had committed this new law violation and, on January 17, 2024, sentenced Defendant to 24 months in prison. (*Id.*)

### III. THE SCOPE OF CROSS-EXAMINATION OF DEFENDANT

Before turning to the substance of the pending motions, I must address an evidentiary issue. At the hearing Defendant testified regarding his efforts to obtain his cell phone from the CRPD. Prior to testifying I reminded Defendant of his Fifth Amendment right to remain silent. I also warned him that if he testified, he would be subject to cross-examination by the Government. As stated above, Defendant testified solely about his efforts to obtain his cell phone. When the Government commenced cross-examination, its first inquiries related to Defendant's presence in the SUV on October 21, 2023 and who was driving. (Defendant's Hr'g Test. at 90.) Defense counsel objected that questioning was "outside the line of questioning from the direct." (*Id.* at 91.) The Government responded:

He's testifying on issues related to both the motion to suppress as well as the motion to dismiss, and he's opened himself up to any questioning related to the topics raised in his motions, which include incidents that took place. He's written -- his counsel has written that there was a traffic stop as part of this motion, and the government is within its rights in this hearing to

14

question him about the traffic stop and the incidents happening. He is not able to insulate himself and only talk about one component of his motion to suppress just because that's all he wants to talk about.

(*Id.*)

The Government further argued:

The Court is going to have to make a credibility determination as to whether or not the defendant's testimony today is credible, and I don't know how much the Court has watched of the videos, but the defendant repeatedly lied that night to police. And the government is fully within its rights to explore topics with this defendant in this hearing that go to his bias and motivation to lie and so the Court can adequately judge whether or not what he just said is truthful or not.

(*Id.* at 93.)

At this point in the hearing, with the allotted time running low, I instructed the Government to complete its questioning of the Defendant about his request for the return of the cell phone and directed the parties to file briefs regarding whether Defendant should be subject to cross-examination regarding the events of that night based on his testimony about his efforts to reclaim his cell phone. That is, in the jargon of trial lawyers, whether Defendant had "opened the door" to such cross-examination. My intention was to reopen the hearing for further cross-examination, if necessary. For the reasons discussed below, I find that no hearing is required. If the Court disagrees and concludes a further hearing would be helpful or necessary, I am happy to hold a supplemental hearing.

A.      *The parties' arguments*

Defendant first asserts his Fifth Amendment privilege against self-incrimination. He notes, however, the limits on that protection when the accused chooses to testify:

When he takes the stand in his own behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined as to the facts in issue. His failure to deny or explain evidence of incriminating circumstances of which he may have knowledge may be the basis of adverse

15

> inference, and the jury may be so instructed. His waiver is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing.
>
> If, therefore, the question asked of the defendant were logically relevant, and competent within the scope of the rules of cross-examination they were proper questions, unless there is some reason of policy in the law of evidence which requires their exclusion.

*Raffel v. United States*, 271 U.S. 494, 497 (1926) (citations omitted). Defendant asserts that Federal Rule of Evidence 611(b) limits cross-examination to the subject matter of the direct examination and credibility of the witness. He also notes that the scope of cross-examination is within the district court's discretion.

The Government first points to Rule 1101(d) which provides that the Federal Rules of Evidence do not apply in hearings on preliminary questions of fact governing admissibility. (Doc. 44 at 1.) The Government acknowledges Rule 104(d) which states, "By testifying on a preliminary question, a defendant in a criminal case does not become subject to cross-examination on other issues in the case," but argues its cross-examination is not directed toward other issues. Rather, the Government asserts it intended to address "issues raised in Defendant's motion to suppress" and "his bias and credibility." (*Id.* at 1 n.1.)

The Government then asserts that the Federal Rules of Evidence do not apply during a suppression hearing and, therefore, the Rules cannot limit the scope of the Government's cross-examination. The Government relies on a variety of cases that permitted cross-examination of a defendant beyond the narrow limits the defendant sought to impose. For example, the Government relies on *United States v. Roberts* which permitted extensive cross-examination regarding the voluntariness of the defendant's statements:

[The defendant testified] he was under the influence of methamphetamine, a drug which he stated gives the user a false sense of security; he was not read his *Miranda* rights; he was handcuffed; and officers held a gun to his head. On cross-examination, the government challenged each of these statements and attempted to show defendant was, in fact, rational and functioning properly during that time as evidenced by his ability to direct sales and collect money. Although the trial court sustained a number of defense counsel's objections, it overruled objections to questions about whether Roberts knew what he was doing was illegal, as evidenced by a comment he made about President Bush's speech on the War on Drugs. The court opined, because the hearing measured the sole issue of voluntariness, defendant could not pick and choose what evidence manifested his mental state at the time of his confession.

14 F.3d 502, 516–17 (10th Cir. 1993).

**B.    Discussion**

Federal Rule of Evidence 1101 governs their applicability and, generally speaking, carves out an exception for hearings like a motion to suppress[11] where the issue is admissibility:

(d) Exceptions. These rules--except for those on privilege--do not apply to the following:
> (1) the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility; . . .

Fed. R. Evid. 1101. Relatedly, Rule 104(a) states:

**(a) In General.** The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, *the court is not bound by evidence rules*, except those on privilege.

(Emphasis added.)

---

[11] Neither party has asserted that a different rule should apply to a motion to dismiss which is also before the Court.

The difference between whether the rules are wholly inapplicable per rule 1101(d) or whether the court is simply "not bound" by them per Rule 104(a) is significant. As stated in *United States v. Henderson*, it is not as though the Rules of Evidence are wholly inapplicable in proceedings such as these:

> Admission of evidence at a suppression hearing is reviewed for abuse of discretion. *United States v. Taylor*, 106 F.3d 801, 803 (8th Cir.1997). But "the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence." *United States v. Matlock*, 415 U.S. 164, 172–73, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (discussing Fed. R. Evid. §§ 104(a), 1101(d)); *see also United States v. Raddatz*, 447 U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("[T]he interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself. At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.").

471 F.3d 935, 937–38 (8th Cir. 2006). Indeed, Rule 104 does not say the Court cannot apply the Rules of Evidence, merely that it is not "bound" by them.

The purpose of suspending (or at least relaxing) the Rules of Evidence for suppression hearings is not to suggest that such hearings are a free-for-all with a court required to hear and accept all proffered evidence. Nor, indeed, does either party suggest that. In fact, the Government seems to agree there are limits on cross-examination when it states, "This is not to say there are no limits on cross examination during a suppression hearing. The Court retains wide latitude to carry out courtroom administration and can, for example, limit questions that are repetitive or clearly irrelevant under this discretion." (Doc. 44 at 5.) Relaxing the rules of evidence for preliminary hearings is based on the notion that judges (unlike juries) have the necessary training and experience to assess evidence without the formal application of the rules.

> That the same rules of evidence governing criminal jury trials are not generally thought to govern hearings before a judge to determine evidentiary questions was confirmed on November 20 last year when the

Court transmitted to Congress the proposed Federal Rules of Evidence. Rule 104(a) provides that preliminary questions concerning admissibility are matters for the judge and that in performing this function he is not bound by the Rules of Evidence except those with respect to privileges. Essentially the same language on the scope of the proposed Rules is repeated in Rule 1101(d)(1). The Rules in this respect reflect the general views of various authorities on evidence. 5 J. Wigmore, Evidence s 1385 (3d ed. 1940); C. McCormick, Evidence s 53, p. 122 n. 91 (2d ed. 1972). *See also* Maguire & Epstein, Rules of Evidence in Preliminary Controversies as to Admissibility, 36 Yale L.J. 1101 (1927). . .

There is, therefore, much to be said for the proposition that in proceedings where the judge himself is considering the admissibility of evidence, the exclusionary rules, aside from rules of privilege, should not be applicable; and the judge should receive the evidence and give it such weight as his judgment and experience counsel. However that may be, certainly there should be no automatic rule against the reception of hearsay evidence in such proceedings. . . .

*United States v. Matlock*, 415 U.S. 164, 173–75 (1974).

So, while Rule 1101(d) may except preliminary hearings regarding the admissibility of evidence from the application of the rules themselves, I conclude that a better reading is that the Rules are not wholly inapplicable. Rather, as the Eighth Circuit quoted *Matlock* in *Henderson,* the rules simply "do not operate with full force at hearings before the judge to determine the admissibility of evidence." 471 F.3d at 937–38.

Privilege rules still apply in preliminary hearings under Rule 1101(d). I take this to mean that a party can raise a privilege in a preliminary hearing and the Court must follow Rules 501 and 502, where applicable, to resolve the issue presented. I also take this reference to reflect the importance of maintaining the sanctity of privileges. The sanctity of the privilege against self-incrimination is underscored by Rule 104(d) which provides: "By testifying on a preliminary question, a defendant in a criminal case does not become subject to cross-examination on other issues in the case." The note regarding

this part of the rule states, "The limitation upon cross-examination is designed to encourage participation by the accused in the determination of preliminary matters. He may testify concerning them without exposing himself to cross-examination generally. The provision is necessary because of the breadth of cross-examination under Rule 611(b)."

Thus, despite the exception for determination of "a preliminary question of fact governing admissibility" under Rule 1101(d), I find that the authority to limit the scope of cross-examination arises from the Rules of Evidence, the inherent power of the Court to control proceedings before it, and its obligation to adjudicate disputes over privileges.

The Rules provide a framework for determining this dispute, the crux of which arises from the interplay of the limitations on cross-examination in Rule 104(d), Rule 608(b) regarding the witness's character for truthfulness, and Rule 611 on the scope of cross-examination more generally. Rule 611 provides, in pertinent part:

Mode and Order of Examining Witnesses and Presenting Evidence

**(a) Control by the Court; Purposes.** The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:
> **(1)** make those procedures effective for determining the truth;
> **(2)** avoid wasting time; and
> **(3)** protect witnesses from harassment or undue embarrassment.

**(b) Scope of Cross-Examination.** Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility. The court may allow inquiry into additional matters as if on direct examination.

Fed. R. Evid. 611. Rule 608(b) provides:

**(b) Specific Instances of Conduct.** Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be

inquired into if they are probative of the character for truthfulness or untruthfulness of:

> (1) the witness; or

> (2) another witness whose character the witness being cross-examined has testified about.

> *By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.*

Fed. R. Evid. 608 (emphasis added). The Advisory Committee's note regarding the italicized sentence is helpful:

> The final sentence constitutes a rejection of the doctrine of such cases as *People v. Sorge,* 301 N.Y. 198, 93 N.E.2d 637 (1950), that any past criminal act relevant to credibility may be inquired into on cross-examination, in apparent disregard of the privilege against self-incrimination. While it is clear that an ordinary witness cannot make a partial disclosure of incriminating matter and then invoke the privilege on cross-examination, no tenable contention can be made that merely by testifying he waives his right to foreclose inquiry on cross-examination into criminal activities for the purpose of attacking his credibility. So to hold would reduce the privilege to a nullity. While it is true that an accused, unlike an ordinary witness, has an option whether to testify, if the option can be exercised only at the price of opening up inquiry as to any and all criminal acts committed during his lifetime, the right to testify could scarcely be said to possess much vitality. In *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Court held that allowing comment on the election of an accused not to testify exacted a constitutionally impermissible price, and so here. While no specific provision in terms confers constitutional status on the right of an accused to take the stand in his own defense, the existence of the right is so completely recognized that a denial of it or substantial infringement upon it would surely be of due process dimensions. *See Ferguson v. Georgia,* 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961); McCormick § 131; 8 Wigmore § 2276 (McNaughton Rev.1961). In any event, wholly aside from constitutional considerations, the provision represents a sound policy.

Fed. R. Evid. 608

In the case at bar, Defendant testified only about his efforts to get his phone back. Defendant did not testify regarding any of the events on the night of his arrest. In fact, his testimony commenced with his release from jail the following morning. How one frames the "matter" Defendant testified about is significant. Was Defendant testifying about "another matter" under Rule 611(b) such that his "privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness" remains intact? Is the "preliminary question" Defendant was testifying about under Rule 104(d) so broad that he is subject to cross-examination regarding the events leading to his arrest or are those "other issues in the case?"

Here, the Government contends that by testifying at all at the suppression hearing, Defendant has opened himself to cross-examination on:

> (1) all of the issues raised in the defendant's motion to suppress (even if some of these issues fall outside the scope of defendant's direct); and (2) questions designed to impeach defendant's credibility. And what constitutes proper impeachment is broadly construed; including such topics as the underlying offense charged or a defendant's prior gang affiliation.

(Doc. 44 at 5.)

I respectfully disagree. The Government relies principally on *United States v. Gomez-Diaz*, 712 F.2d 949 (5th Cir. 1983) and *United States v. Roberts*, 14 F.3d 502 (10th Cir. 1983). In *Gomez-Diaz* the issue was whether the defendant had consented to the x-ray that revealed 69 balloons in his abdomen. At a suppression hearing,

> the magistrate refused to limit examination to the yes/no question of whether Gomez-Diaz gave his consent. The magistrate explained that should Gomez-Diaz take the stand during the hearing, the government would be allowed to cross-examine him about any matters relating to his alleged consent that occurred during the time he was detained for examination. As a result, Gomez-Diaz declined to testify at the hearing. . . .

The magistrate, however, stated that if Gomez-Diaz took the stand, he would be open to cross-examination on any matter that occurred during his detention by customs officials which related to the issue of consent. Given that ruling, Gomez-Diaz chose not to testify. The magistrate ruled correctly. There is no federal right to limit the testimony of a witness on a preliminary matter to one single phase of an issue. The Federal Rules of Evidence provide that "[t]he accused does not, by testifying upon a preliminary matter, subject himself to cross-examination as to other issues in the case." Fed. R. Evid. 104(d). The issue at this point in the case was whether Gomez-Diaz consented to the x-ray. The issue of consent goes beyond a single yes or no answer to the question of whether he verbally agreed to the x-ray.

712 F.2d at 950–51. In *Roberts*, also cited by the Government, the defendant argued his confession was involuntary and sought to have his confession suppressed because it was involuntary. The Tenth Circuit explained:

On cross-examination, the government challenged each of these statements and attempted to show defendant was, in fact, rational and functioning properly during that time as evidenced by his ability to direct sales and collect money. Although the trial court sustained a number of defense counsel's objections, it overruled objections to questions about whether Roberts knew what he was doing was illegal, as evidenced by a comment he made about President Bush's speech on the War on Drugs. The court opined, because the hearing measured the sole issue of voluntariness, defendant could not pick and choose what evidence manifested his mental state at the time of his confession. . . .

Although Rule 104(d) circumscribes the government's cross-examination to the issue of voluntariness, defendant's credibility is inextricably tied to that resolution. In *United States v. Williams*, 754 F.2d 672, 676 (6th Cir.1985), the Sixth Circuit rejected a similar challenge, finding the trial court did not err in compelling defendant to answer the government's question if he knew he was carrying drugs, given his earlier denial he was nervous. The court held the question was proper "because he had placed his own credibility in issue by his earlier testimony." *Id*.

23

> Moreover, once defendant takes the stand on this preliminary matter, Rule 104(d) does not permit him to define the question of voluntariness. "There is no federal right to limit the testimony of a witness on a preliminary matter to one single phase of an issue." *United States v. Gomez–Diaz*, 712 F.2d 949, 951 (5th Cir.1983) ("The issue of consent goes beyond a single yes or no answer to the question of whether [defendant] verbally agreed to the x-ray."), cert. denied, 464 U.S. 1051, 104 S.Ct. 731, 79 L.Ed.2d 191 (1984).
>
> Given the government's burden of proving voluntariness, the district court did not abuse its discretion in permitting the prosecutor to question Roberts about his awareness and mental capacity to run a business during the time he maintained he was substantially under the influence of drugs.

*Roberts*, 14 F.3d at 517. Neither *Roberts* nor *Gomez-Diaz* stands for the proposition that by testifying about a discrete issue, a defendant may be required to testify regarding "all the issues raised in his motion to suppress." (Doc. 44 at 6.) The issue of consent or voluntariness lends itself to a larger scope of cross-examination because the circumstances surrounding consent or voluntariness (e.g., the defendant's state of mind, why he might have been nervous, etc.) are likely to overlap with the events that makeup the underlying criminal prosecution. *See, e.g.*, *United States v. Perez*, No. 16 CR 337, 2018 WL 1064706, at *3 (N.D. Ill. Feb. 27, 2018) ("Defendant's state of mind during her discussion with the agents—is particularly crucial in the case at bar as the main thrust of Defendant's motion is that she was a frail 'grandmother' who was particularly susceptible to coercion or intimidation"); *United States v. Jaswal*, 47 F.3d 539, 543 (2d Cir. 1995) ("As the defendant denied having said (or read) what was in the statement he signed, it was proper for the government to cross-examine him as to its accuracy to rebut his contention that its contents came from the agent, rather than from himself"); *United States v. Williams*, 754 F.2d 672, 676 (6th Cir. 1985) (cross-examination about defendant's knowledge of drugs on his person were proper where defendant had denied showing signs of nervousness at the time of apprehension).

Here, unlike cases where consent or voluntariness is the subject of the accused's testimony (or, for that matter, anything about the criminal conduct), the issue Defendant testified about is well defined and cabined off from the underlying conduct on October 23, 2023. I decline to find that the "preliminary question" Defendant testified to under Rule 104(d) as the entirety of the motion to suppress. Rather, Defendant testified only about efforts to get his cell phone back. Thus, under Rule 104(d), by testifying on this preliminary question Defendant did not become subject to questions about other issues in the case. Similarly, I conclude any questions about what happened on October 23, 2023 are beyond the scope of the direct examination.

What remains is whether the Government is permitted to question Defendant further to attack Defendant's credibility. At the hearing, the Government argued:

> The Court is going to have to make a credibility determination as to whether or not the defendant's testimony today is credible, and I don't know how much the Court has watched of the videos, but the defendant repeatedly lied that night to police. And the government is fully within its rights to explore topics with this defendant in this hearing that go to his bias and motivation to lie and so the Court can adequately judge whether or not what he just said is truthful or not.

(Hearing Tr. at 93.) Rule of Evidence 608 governs how a witness's character for truthfulness or untruthfulness may be attacked or supported.[12] To reiterate, the pertinent part of Rule 608(b) states,

> **(b) Specific Instances of Conduct.** Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:

---

[12] Even if the Rules of Evidence are not otherwise applicable on a preliminary question of fact regarding admissibility under Rule 1101(d), Rule 608 relates, in part, to the privilege against self-incrimination and therefore it applies at all stages of the proceedings. Fed. R. Evid. 1101(c).

> (1) the witness; or
>
> (2) another witness whose character the witness being cross-examined has testified about.
>
> *By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.*

Fed. R. Evid. 608 (emphasis added). In dicta, at least one court has interpreted this rule to permit cross-examination of anything about the charged criminal conduct:

> Rule 608(b) provides, in pertinent part: "The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility." The purpose of this part of Rule 608 is to make clear that, while a witness' credibility may be attacked on cross-examination by reference to specific instances of conduct probative of the witness' character for truthfulness, a witness may nonetheless invoke the fifth amendment privilege and refuse to answer questions about past conduct. Fed. R. Evid. 608 advisory committee note. The rule has nothing to do with the scope of a testifying defendant's waiver of the privilege with respect to the crime with which he is charged. *Id.*

*United States v. Blankenship*, 746 F.2d 233, 238 (5th Cir. 1984). I disagree with the breadth of this interpretation of the waiver of the privilege. In *Blankenship* and one case that relies upon it, the defendant testified about the charged criminal conduct and not some collateral issue, like the subsequent effort to obtain the return of seized property. *United States v. Lester*, 42 Fed. Appx. 257, 261 (10th Cir. 2002) (unpublished) ("While the government's questioning of Mrs. Lester regarding her tax returns clearly implicated her credibility, it is indisputable that the questioning bore directly on her claims that she was entitled to the checks and that they represented additional income to her. Thus, the questioning did not relate "only to credibility" and no violation of Rule 608 occurred.").

In the case at bar, I conclude that Defendant testified solely regarding a collateral matter having little if anything to do with the offense conduct. The Government fully

examined Defendant regarding the "subject matter of the direct examination" and the only basis for further cross-examination is Defendant's credibility. Fed. R. Evid. 611(b).

I am exercising my discretion under Rule 608 ("the court may, on cross-examination, allow . . ."), to foreclose further cross-examination of Defendant. "Federal Rule of Evidence 608(b) allows prior acts to 'be inquired into on cross-examination, at the discretion of the court, if they are probative of a witness's truthfulness or untruthfulness.'" *United States v. Johnson*, No. 21-1322, 2022 WL 866284, at *2 (3d Cir. Mar. 23, 2022) (quoting *United States v. Davis*, 183 F.3d 231, 257 (3d Cir. 1996)). There is apparently no dispute that the phone belongs to Defendant or that he has standing to challenge his detention. The significance of Defendant's testimony relates solely to when and whether he asked for his cell phone back which, in turn, relates solely to the significance of deprivation arising from its seizure.

In exercising my discretion, I bear in mind the narrowness of the issue before me. At stake is merely whether further examination about the events of October 23, 2023 would affect the credibility of Defendant's statements about seeking return of his cell phone. It seems highly unlikely any cross-examination would undermine the conclusion that Defendant wanted his phone back, that he asked for it back at some point, and that being deprived of his phone was at least inconvenient. In other words, even if the Government administered the most devastating cross-examination, showing Defendant to be a liar with his pants figuratively on fire about everything that happened on October 23, it is still believable that he wanted the cell phone back and that he may have asked for it before he went into federal custody. Here's why: First, it is 2025. Phones are important to people, and they use them regularly. When people are deprived of their cell phones, it is inconvenient, and they want them back. Officer O'Brien stated:

> What I have found over the years is that cell phones, they're – they're a part of pretty much everybody's daily life. They're used for almost all forms of communication.

(O'Brien Hr'g Test. at 52.) This conclusion is, if anything, an understatement. In this case, the video shows that Defendant keeps his car insurance information on his phone. (Ex. 4 at 31:55-32:39.) Second, Defendant eventually did ask for his phone back in April, 2025. (Ex. 9.) Thus, this is not a case where Defendant is distancing himself from evidence on the scene (like the firearm) and there is no question that he claims ownership of it. Third, Officer O'Brien offered a cogent explanation of how Defendant could have asked for the phone at the front desk, but because it had not been processed, he would have been told the CRPD did not have it and there would be no record of it. Fourth, there is no reason to believe that if he had asked for his phone in October 2023 *and the request was noted by the CRPD*, that anything different would have happened regarding the investigation. For example, there is no reason to believe that the investigation would have been expedited merely because the CRPD learned Defendant wanted his phone back. Finally, for the reasons discussed below, whenever he asked for his phone back, I recommend the Court reach the same conclusions regarding whether to suppress the evidence. Thus, Defendant's objection to further cross-examination of Defendant is sustained.

## IV.   THE MOTION TO SUPPRESS

### A.   The parties' arguments

Defendant argues that law enforcement lacked articulable and reasonable suspicion to stop the SUV. (Doc. 25 at 2, ¶ 6.) Defendant also seems to argue that his flight from the SUV did not provide independent grounds for arrest. (*Id.* at 4, ¶¶ 12-16.) Defendant asserts his Fifth Amendment rights were violated when he was questioned by law enforcement after invoking his right to counsel and the questioning was not attenuated. (*Id.* at 5, ¶¶ 17-19.) Defendant contends the seizure of his cell phone lacked probable cause. (*Id.* at 6, ¶¶ 20-22.) Defendant also asserts that the evidence recovered from the

search of the phone must be suppressed due to the delay in requesting a search warrant and because he believes that the phone was searched prior to the issuance of the warrant. (*Id.* at 7-13, ¶¶ 25-38.)

The Government resists the motion to suppress. First, the Government argues that law enforcement did not initiate a traffic stop. Instead, the driver of the SUV pulled onto a yard and both occupants fled to avoid contact with the police. The seizure of Defendant did not occur until after he had interfered with official acts. (Doc. 36 at 11.) Second, the Government contends that Defendant was not interrogated after invoking his right to counsel. Rather, any questions related to permissible administrative tasks (i.e., making inquiries about the SUV to facilitate towing it from a third party's yard). The Government also asserts that Defendant volunteered information about his possession of a cell phone. The Government contends suppression of the physical evidence (i.e., the phone) is not the proper remedy for a *Miranda* violation. Third, the Government contends it had probable cause to seize the phone. Alternatively, the Government asserts no probable cause was necessary because Defendant has abandoned the phone. The Government also argues that the phone's seizure would have been inevitable when the SUV was towed and inventoried. (*Id.* at 16-17.) Fourth, the Government alleges that the time between the seizure of the phone and its search was not unreasonable. (*Id.* at 18.) Relatedly, the Government also asserts the *Leon* good faith doctrine applies. (*Id.* at 23-24.) Fifth, the Government argues that there is no evidence of a search of the phone prior to the issuance of a warrant.

### B. Relevant law

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A Fourth Amendment seizure occurs 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a

29

citizen.'" *United States v. Flores-Lagonas*, 993 F.3d 550, 559 (8th Cir. 2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)).  In the context of an individual fleeing from law enforcement, the United States Supreme Court has explained that:

> The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.  ("She seized the purse-snatcher, but he broke out of her grasp.")  It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee.  That is no seizure. . . .  An arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority.

*California v. Hodari D.*, 499 U.S. 621, 626 (1991).  A seizure only occurs when, "in the totality of the circumstances surrounding the encounter, a reasonable person would believe that [he] is not free to leave."  *United States v. Pena-Saiz*, 161 F.3d 1175, 1177 (8th Cir. 1998) (citing *United States v. Thompkins*, 998 F.2d 629 (8th Cir. 1993)); *see also United States v. Lillich*, 6 F.4th 869, 875 (8th Cir. 2021) ("To determine whether a police-citizen encounter is consensual or implicates Fourth Amendment protections, we must 'consider[ ] the totality of the circumstances' and 'the unique facts of each case'") (quoting *United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012))).

Fleeing from an invalid *Terry* stop creates probable cause to effect an arrest for interference with official acts in violation of Iowa Code Section 719.1: "[E]ven if the officers were not justified in conducting [a] *Terry* stop . . ., they had probable cause to arrest [the defendant] for interference with official acts once [the defendant] resisted and started to run."  *McElree v. City of Cedar Rapids, Iowa*, 372 F.Supp.3d 770, 791 (N.D. Iowa 2019), aff'd sub nom. *McElree v. City of Cedar Rapids*, 983 F.3d 1009 (8th Cir. 2020).

In *United States v. Dawdy*, around 10:00 p.m. a state trooper observed a vehicle parked behind a closed pharmacy.  The vehicle was occupied with the lights off.  The trooper entered the parking lot to investigate.  As the trooper entered the parking lot, the

30

defendant turned his car around and drove toward the entrance of the lot. The trooper indicated that the defendant should stop, and he did. The trooper took the defendant's driver's license to run a warrant check. The trooper observed the defendant drop a key from the open window of his car, the trooper picked it up and returned it to the defendant. Another trooper who arrived on the scene found a leather pouch containing a white powdery substance lying near the car. The first trooper asked the defendant to exit the vehicle, and he was placed under arrest. However, when the trooper attempted to handcuff the defendant, he resisted and threw away the key that he had dropped earlier. A search of the defendant revealed a large amount of cash and a search of the interior of the vehicle revealed a small scale. During an inventory search of the car, law enforcement realized that the key to the trunk was missing. Law enforcement searched the area where the defendant had thrown it away and found it. Inside the trunk law enforcement found more white powder, both the powder from the pouch and the trunk field tested positive as an amphetamine. 46 F.3d 1427, 1428-29 (8th Cir. 1995). The district court suppressed all the evidence except for the leather pouch found near the vehicle. *Id*. at 1429. The Eighth Circuit reversed the district court and held, among other things, that "a defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest." *Id*. at 1431. Further, the Eighth Circuit stated that, "assuming arguendo that [the trooper's] initial stop and arrest of [the defendant] were invalid, [the defendant's] resistance provided independent grounds for his arrest, and the evidence discovered in the subsequent searches of his person and his automobile is admissible." *Id*.

In *United States v. Thurmond*, No. CR05-2023, 2005 WL 2216896 (N.D. Iowa Sept. 12, 2005), following a traffic stop, the defendant fled the scene in his vehicle and led law enforcement on a high-speed chase before ditching his vehicle and fleeing on foot. *Id*. at *1. While fleeing on foot an officer in pursuit observed the defendant throw

31

a firearm into a wooded area. Eventually, Officers found the gun and also searched the abandoned vehicle where they found narcotics under the driver's seat. *Id*. at *1-*2. Applying the reasoning in *Dawdy*, then Magistrate Judge John A. Jarvey, addressed the issue in the case as follows:

> [The defendant] seeks the suppression of the gun and narcotics seized on August 2, 2004, as fruit of an illegal search. He cites no authority for his claim of entitlement to flee from a traffic stop. [The defendant] alleges that [the police officer] improperly detained him after the initial traffic stop had concluded and that [the officer] lacked reasonable, articulable suspicion to detain [the defendant] after the conclusion of the traffic stop. The government alleges that the initial traffic stop of [the defendant] was lawfully extended as an investigative stop and that, regardless of the legality of [the defendant'] detention beyond the initial stop, [the defendant's] subsequent illegal actions provided independent grounds for the seizure of the evidence at issue. . . .
>
> Waterloo Police had sufficient probable cause to arrest [the defendant] after [the defemdamt] fled the initial traffic stop, led officers on a high-speed chase through Waterloo, brandished a weapon, and did not heed numerous requests by [law enforcement] to stop. Any evidence seized from [the defendant's] vehicle, person, or any evidence he abandoned on August 2, 2004, after he eluded police, should be admissible.

*Id*. at *3. The Fourth Amendment also prohibits unreasonable seizures of property. *United States v. Mays*, 993 F.3d 607, 614 (8th Cir. 2021). In the context of property, an exception to the warrant requirement "is when 'law enforcement authorities have probable cause to believe' property 'holds contraband or evidence of a crime' and 'the exigencies of the circumstances demand' immediate seizure 'pending issuance of a warrant to examine its contents.'" *Id*. (quoting *United States v. Place*, 462 U.S. 696, 701 (1983)). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Wells*, 347 F.3d 280,

287 (8th Cir. 2003) (quoting *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000)). Because "[p]robable cause is a practical and common-sensical standard," officers may draw inferences from the evidence based on their own experiences as to whether probable cause exists. *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (internal quotation marks and citations omitted). "Probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (quoting *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001)) (internal ellipses omitted).

Additionally, "[a] warrantless search of abandoned property does not implicate the Fourth Amendment, [because] any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. Smith*, 648 F.3d 654, 660 (8th Cir. 2011) (second alteration in original) (quoting *United States v. James*, 534 F.3d 868, 873 (8th Cir. 2008), in turn quoting *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir.1997)). The Eighth Circuit explained that "[t]he issue is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished [his] reasonable expectation of privacy so that the search and seizure is valid." *Id.* (second alteration in original) (quoting *United States v. Hoey*, 983 F.2d 890, 892–93 (8th Cir.1993)).

"Given the volume and sensitive nature of information stored on modern cell phones, a warrant is generally required before the search of a cell phone seized incident to arrest." *United States v. Bragg*, 44 F.4th 1067, 1071 (8th Cir. 2022) (quotation omitted). "Because a seizure is generally less intrusive than a search, the Supreme Court 'has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search . . . would have been held impermissible.'" *Id.* (quoting *Segura v. United States*, 468 U.S. 796, 806

(1984)). "However, 'a seizure reasonable at its inception . . . may become unreasonable as a result of its duration.'" *Id*. (quoting *Segura*, 468 U.S at 812). In determining unreasonable delay in applying for a warrant to search a seized cell phone, courts must "balance 'privacy-related and law enforcement-related concerns.'" *Id*. at 1072 (quoting *United States v. Mays*, 993 F.3d 607, 616-17 (8th Cir. 2021)). Specifically,

> On the private-interests side, relevant considerations include the significance of the interference with the person's possessory interest, the duration of the delay, whether the person consented to the seizure, and the nature of the seized property. On the government-interests side, relevant considerations include the government's legitimate interest in holding the property as evidence, the nature and complexity of the investigation, the quality of the warrant application and the amount of time we expect the application would take to prepare, and any other evidence proving or disproving law enforcement's diligence in obtaining the warrant.

*Id*. (quoting *Mays*, 993 F.3d at 617).[13]

"The familiar *Miranda* rule provides as a general matter that investigators must communicate warnings to a suspect before conducting a custodial interrogation." *United States v. Armstrong*, 39 F.4th 1053, 1056 (8th Cir. 2022). "*Miranda* warnings are required only when a person is in custody, because they are intended to 'protect the individual against the coercive nature of custodial interrogation.'" *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2020) (quoting *United States v. Thomas*, 664

---

[13] Other Circuit Courts have set forth similar factors for consideration in determining whether law enforcement has waited an unreasonable time before obtaining a search warrant. *See United States v. Smith*, 967 F.3d 198, 206 (2d Cir. 2020) (setting forth the following factors "[1] the length of the delay, [2] the importance of the seized property to the defendant, [3] whether the defendant had a reduced property interest in the seized item, and [4] the strength of the state's justification for the delay") (alterations in original); *United States v. Laist*, 702 F.3d 608, 613-14 (11th Cir. 2012) (setting forth the following factors: "first, the significance of the interference with the person's possessory interest; . . . second, the duration of the delay; . . . third, whether or not the person consented to the seizure; . . . and fourth, the government's legitimate interest in holding the property as evidence") (citations omitted).

F.3d 217, 222 (8th Cir. 2011), in turn quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)).  Interrogation "refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  "A person is considered to be in custody for the purposes of *Miranda* warnings when there is a 'formal arrest or restraint [on his or her] freedom of movement of the degree associated with formal arrest.'" *United States v. Sandell*, 27 F.4th 625, 628-29 (8th Cir. 2022) (quoting *United States v. Parker*, 993 F.3d 595, 601 (8th Cir. 2021)).  However, "not all government inquiries to a suspect in custody constitute interrogation and therefore need be preceded by *Miranda* warnings." *United States v. Tapia-Rodriguez*, 968 F.3d 891, 894 (8th Cir. 2020) (quoting *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985)).  "'A request for routine information necessary for basic identification purposes is not interrogation' unless 'the government agent should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged.'" *Id.* (quoting *United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1038 (8th Cir. 2010)).  Similarly, questioning that is "reasonably related to the police's administrative concerns" does not constitute interrogation.  *Id.* at 896 (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990) (opinion of Brennan, J.); *United States v. Gaston*, 357 F.3d 77, 82 (D.C. Cir. 2004)).  Moreover, "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) (quoting *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir.1997)); *see also United States v. Hatten*, 68 F.3d 257, 262 (8th Cir. 1995) ("We have repeatedly held that '[a] voluntary statement made by a suspect, not in response to interrogation, is not

barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings.'") (Quoting *Innis*, 446 U.S. at 299).

## C.   *Application*

### 1.   *Whether there was an illegal stop*

Contrary to Defendant's first argument that Officers Bailey and Cavin conducted an illegal traffic stop, the record demonstrates that the officers did not initiate a traffic stop.  The officers did not activate the patrol vehicle's emergency lights or attempt to pull Defendant's vehicle over.   Instead, Officer Bailey testified that he observed Defendant's vehicle driving toward him and noticed that the vehicle lacked a front license plate.  Officer Bailey performed a U-turn to investigate a possible law violation.  As the officers turned around, the SUV abruptly turned right, jumped a curb, and stopped on the lawn of a residence.  (Bailey Hr'g Test. at 7.)  Defendant and the driver fled the scene on foot, leaving the vehicle illegally parked with the doors open.  (*Id*.)  Based on the foregoing, I find that Defendant's first argument—an improper traffic stop—lacks merit and is not supported by the record.

Even if the officers performed an improper *Terry* stop, which they did not, fleeing from the officers created probable cause to effect an arrest for interference with official acts in violation of Iowa Code Section 719.1.  *See Dawdy*, 46 F.3d at 1431; *McElree*, 372 F.Supp.3d at 791; *Thurmond*, 2005 WL 2216896, at *3.  By abandoning the vehicle in the middle of a residential front lawn, fleeing on foot, and refusing to comply with law enforcement commands to stop, Defendant's actions provided law enforcement with probable cause to seize and arrest Defendant for interference with official acts.

Moreover, Defendant's attempt to distinguish this case based on *Wong Sun v. United States*, 371 U.S. 471 (1963) is misplaced.  In *Wong Sun*, a federal agent, at 6:00 a.m., two hours before the business opened, rang the bell and the owner of the business answered the door.  The agent told the owner he was there to pick up laundry and dry

36

cleaning. The owner told the agent to come back at 8:00 a.m. when the business opened. The owner began closing the door and the agent pulled out his badge and told the owner he was a federal narcotics agent. The owner slammed the door and ran down the hallway. The agent along with other agents broke open the door and followed the owner down the hallway into a living quarters and bedroom at the back of the business. The owner was placed under arrest and handcuffed. *Id*. at 473-74. The Supreme Court held that "the officers' uninvited entry into [the owner's] living quarters was unlawful and that the bedroom arrest which followed was likewise unlawful." *Id*. at 484. The Supreme Court explained that "[a] contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked." *Id*. The situation in the present case is easily distinguishable. Here, it was 1:30 a.m. and after observing Defendant's vehicle without front license plates, the officers performed a U-turn without engaging the emergency lights and Defendant's vehicle abruptly turned right, jumped a curb, and stopped on the lawn of a residence. Defendant and the driver immediately exited the vehicle and fled on foot. The officers had reasonable suspicion that criminal activity was afoot and probable cause to arrest Defendant for interfering with official acts. *Wong Sun* is no help to Defendant.

### 2. *Whether Defendant's Fifth Amendment rights were violated*

It is undisputed that Defendant was arrested and therefore in custody for purposes of *Miranda*. *See Sandell*, 27 F.4th at 628-29. It is also undisputed that Defendant informed the officers that he wished to speak with his attorney. Finally, it is not disputed that upon being arrested Defendant was not read his *Miranda* rights. After Defendant's arrest, he was transferred to the back of Officer Watkins's patrol car. Officer Watkins had not been involved in the chase and initial encounter with Defendant. While sitting in the back of the patrol vehicle, a different officer approached Defendant and asked him

about insurance for his vehicle. Defendant responded that the information was on his cell phone in the car. He identified the phone as red. (Ex. 4 at 32:09.) Prior to speaking with the officer inquiring about car insurance, Defendant, at his own initiation, asked Officer Watkins whether officers had found his phone. (*Id.* at 20:13.) Defendant asserts that this line of questioning was in violation of his *Miranda* rights. I disagree with Defendant's assertion. The officer's question regarding insurance was not an interrogation, as the officer would not believe that the question he asked would be "reasonably likely to elicit an incriminating response" from Defendant.[14] *See Briones*, 390 F.3d at 612 (quotation omitted). Given that Defendant's vehicle was parked on the front lawn of an individual Defendant did not know and the car was going to be towed, the officer's question was "reasonably related to the police's administrative concerns." *See Tapia-Rodriguez*, 968 F.3d at 896 (citation omitted). Finally, Defendant's spontaneous question to Officer Watkins regarding his phone is not protected by *Miranda*, as "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *Crisolis-Gonzalez*, 742 F.3d at 837. Accordingly, contrary to Defendant's assertions, I find that Defendant's rights under *Miranda* with regard to his cell phone were not violated.

However, if the Court disagrees with me and finds that Defendant's *Miranda* rights were violated, suppression of the cell phone is not the proper remedy. The Eighth Circuit has held that "[i]n *Patane*, the Supreme Court held that a violation of the *Miranda* rule does not justify the suppression of non-testimonial physical evidence that is the fruit of custodial interrogation conducted without *Miranda* warnings." *United States v. Morse*,

---

[14] Obviously, this is not a prosecution for failure to maintain motor vehicle insurance. Ultimately, the officer who asked about insurance on the phone decided to take Defendant's word that he had insurance and did not insist Defendant access the proof on his cell phone. (Ex. 4 at 33:40.)

569 F.3d 882, 884 (8th Cir. 2009) (citing *United States v. Pantane*, 542 U.S. 630, 642–44 (2004) (plurality opinion); *id*. at 645 (Kennedy, J., concurring in judgment)); *see also United States v. Morgan*, 729 F.3d 1086, 1091 (8th Cir. 2013) (same). Accordingly, based on the foregoing line of cases, if Defendant's *Miranda* rights were violated—which they were not—the appropriate remedy is the suppression of the statement, not the suppression of physical evidence, i.e., the cell phone.

### 3. Whether the cell phone was legally seized

Next, Defendant argues that his cell phone was improperly seized. First, as discussed above, in *United States v. Smith*, the Eighth Circuit held that "[a] warrantless search of abandoned property does not implicate the Fourth Amendment, [because] any expectation of privacy in the item searched is forfeited upon its abandonment." 648 F.3d at 660 (second alteration in original) (quotations omitted). The Eighth Circuit explained that "[t]he issue is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished [his] reasonable expectation of privacy so that the search and seizure is valid." *Id*. (second alteration in original) (quotation omitted). In *Smith*, the Eighth Circuit determined that the defendant abandoned his vehicle "when he left the car open, with the keys in the ignition, the motor running, in a public area and then ran from the police." *Id*. (quotation omitted). This case is nearly identical to *Smith*. Here, Defendant fled from a vehicle that jumped a curb, stopped on the lawn of a residence unknown to Defendant and the driver, with the lights of the vehicle left on and the vehicle apparently running. (Ex. 1 at 00:04-00:07.) By abandoning the vehicle, law enforcement's search of Defendant's vehicle[15] and seizure

---

[15] The dog sniff around Defendant's vehicle which resulted in a positive alert also provided law enforcement probable cause to search the vehicle. *See United States v. Thin Elk*, 148 F.4th 595, 600 (8th Cir. 2025) ("[A]n alert or an indication 'by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle.'") (Quoting *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010)). Defendant raises no

of the phone did not violate the Fourth Amendment because Defendant forfeited his expectation of privacy in the vehicle where the phone was seized as evidence. *See Smith*, 648 F.3d at 660. This is not to say that by leaving his phone in the vehicle and fleeing, Defendant abandoned all expectation of privacy in the content of the phone, and it could be searched without a warrant. However, as Officer O'Brien testified, the phone as a piece of Defendant's property has separate evidentiary value as tying Defendant to the scene where the alleged interference with official acts and possession of a firearm occurred.

Moreover, regardless of *Smith*, officers had probable cause to seize the phone. When the phone was seized, officers knew that: (1) Defendant had fled from them on foot; (2) Officer Bailey noticed Defendant running with an asymmetrical gait consistent with "pacing," that is, keeping one hand "pinned" at his waist rather than swinging freely and believed this indicated Defendant was carrying a firearm or something "important" in his hand (Bailey Hr'g Test. at 12-13); (3) about 15 or 20 feet from where Defendant stopped running, Officer Bailey located a black pistol; (4) Defendant had a felony conviction and was on federal supervision; (5) the cell phone was located in the vehicle, which belonged to Defendant; and (6) the phone was located on the passenger side of the vehicle where Defendant had been sitting. Based on the totality of the circumstances, I find that law enforcement had probable cause to seize the cell phone as evidence relating to Defendant's possession of the firearm, as Defendant's personal belongings in the area of the firearm supports an inference that the firearm belonged to him.[16]

_____

issue with the canine that performed the vehicle sniff or that the dog was not properly trained and reliable.

[16] Officer O'Brien also described the evidentiary value of cell phones:

What I have found over the years is that cell phones, they're – they're a part of pretty much everybody's daily life. They're used for almost all forms of communication. And in going through cell phones, I find that, one, people like to take pictures of firearms. They like to take pictures of themselves with firearms. Phones are also used to potentially try to obtain a firearm.

Additionally, the seizure of the phone was inevitable. Given that the vehicle was left in the front yard of a residence not belonging to Defendant, it was inevitable that the vehicle would be towed. Thus, an inventory search would have been conducted, resulting in the seizure of the phone. *See United States v. Alvarez-Gonzalez*, 319 F.3d 1070, 1072 (8th Cir. 2003) (applying the inevitable discovery doctrine to a firearm found in a vehicle that "would have been towed, rather than left on the shoulder of the interstate, and a routine inventory search of the vehicle would have been conducted" and "the firearm would have been inevitably discovered during an inventory search of the vehicle.").

### 4. Whether delay in seeking a warrant rendered the search illegal

Next, Defendant contends that the 110-day delay between the seizure of the cell phone and the issuance of the search warrant for the phone is unreasonable and any information recovered from the cell phone should be suppressed. The Government concedes that the phone was seized on October 21, 2023 and law enforcement obtained a federal search warrant for the phone on February 8, 2024, 110 days between the seizure and issuance of the search warrant. In arguing that the delay in obtaining the search warrant was unreasonable, Defendant without any detailed analysis relies on a couple of out-of-circuit cases and *United States v. Fife*, 356 F.Supp.3d 790 (N.D. Iowa 2019). Defendant's reliance of *Fife* is misplaced. First, *Fife* involved a motion to suppress videos and photos containing nude images of minors found on a computer hard drive belonging to Fife and found by Fife's friends and family. One of his friends gave the hard drive to a police officer. The officer waited six months before obtaining a search warrant for the hard drive. 356 F.Supp.3d at 792. Unlike *Fife*, here, as discussed in detail above, the phone was properly seized and the delay in obtaining the search warrant

---

If someone is prohibited, they have to go through a third party that either can lawfully purchase a firearm and is willing to sell it to somebody or they ask friends a lot of times; Google searches for different types of firearms, what they might want to buy.
(O'Brien Hr'g Test. at 52.)

was less than six months. Also, the analysis in *Fife* relies primarily on cases from the Eleventh Circuit. Since *Fife*, in *United States v. Bragg*, 44 F.4th 1067 (8th Cir. 2022), the Eighth Circuit has specifically addressed the issue presently before the court, the delay in obtaining a search warrant for a seized cell phone. Accordingly, I will analyze this matter under the balancing test provided in *Bragg*.

On the private-interests side of the ledger, a 110-day delay in obtaining a search warrant is a concern weighing in Defendant's favor. *See United States v. Mays*, 993 F.3d 607, 617 (8th Cir. 2021) (providing that a 15-day delay in obtaining a search warrant "is a considerable period"); *but see United States v. Jones*, No. 23-cr-10125-ADB, 2024 WL 4542929, at *4-*7 (D. Mass. Oct. 22, 2024) (finding four-month delay in obtaining search warrant for seized cell phone not unreasonable); *United States v. Ortega*, No. 21-CR-665 MV, 2023 WL 2712533, at *5 (D.N.M. Mar. 30, 2023) (finding nine-month delay in obtaining search warrant for seized cell phone not unreasonable); *United States v. Davis*, No. 18-cr-20085-02, 2021 WL 4192045 (E.D. Mich. Sept. 15, 2021) (finding 12-month delay in obtaining search warrant for seized cell phone not unreasonable). By their nature, cell phones have a strong possessory interest which also weighs in Defendant's favor. *See Bragg*, 44 F.4th at 1072. However, "because smartphones retain data for long periods of time, delay between the time a cell phone is seized and when it is searched is not likely to cause stored personal data to be lost, or data of potential evidentiary relevance to become stale." *Id*. (quotation omitted).

At the hearing, Defendant testified that when he was released from the Linn County Jail on October 21, 2023, he received his personal property back, but was told the jail did not have his cell phone. (Defendant Hr'g Test. at 89.) Defendant testified that sometime between October 21, 2023 and October 30, 2023, he went to the CRPD vehicle division to inquire about the vehicle that was towed. He then went to the front desk to ask about his cell phone. Defendant testified he was told they did not have his

42

cell phone in their custody. (*Id.* at 90, 95.) Officer O'Brien testified that, depending on when Defendant contacted the CRPD regarding his phone, it might not have been logged into evidence immediately, particularly after a busy weekend. (O'Brien Hr'g Test. at 105.) Officer O'Brien also noted that October 21, 2023 was a Saturday night and, therefore, the earliest the cell phone would have been logged into evidence would have been Monday, October 23, 2023. (*Id.*) According to Officer O'Brien this sort of communication with the front desk would not be noted. (*Id.* at 106.)

Furthermore, Defendant was arrested on a federal warrant on October 30, 2023. (*Id.* at 57.) Defendant remained in custody of the U.S. Marshals continuously until February 8, 2024, when the warrant to search the phone was issued. Defendant was housed in facilities that do not permit inmates to have cell phones. (*Id.* at 57-58.) The only record of Defendant seeking the return of his cell phone occurred on April 10, 2025. *See* Ex. 9. The record shows that Defendant "cannot have his phone. Obrien [sic] confirmed that the case was adopted Federally and the evidence needs to be retained." *Id.* Officer O'Brien testified that had the police department been contacted before April 10, 2025 by Defendant or a family member, there would have been a similar note, but no such note exists. (O'Brien Hr'g Test. at 59-60.) While Defendant's possessory interest in his cell phone weighs in his favor, it is tempered by the fact that for the majority of the time of the delay, Defendant was in federal custody and could not have the phone. For the short period that Defendant was not in custody, Defendant's testimony suggests that he may have sought the return of his phone from the police, but there is no record of it.

On the government-interests side of the ledger, the Government had a legitimate interest in holding the cell phone as evidence, which weighs in the Government's favor. Specifically, apart from the contents of the cell phone, because the phone was found in Defendant's vehicle and in the passenger compartment where Defendant had been sitting,

it constitutes evidence itself that Defendant possessed the firearm at issue in the instant charge. *See United States v. Burris*, 22 F.4th 781, 785 (8th Cir. 2022) ("Delay in searching a phone is immaterial to the reasonableness of a seizure, however, when the device has independent evidentiary value. If a cellular phone is evidence of a crime regardless of its contents, then the government is justified in retaining the device on that basis alone."). The Government's investigation also weighs in its favor. Here, the investigation involved a DNA warrant, a NIBIN examination, a NEXUS examination, a firearms trace summary, investigation related to other shots fired incidents involving the firearm, and interviewing the driver of the vehicle. Officer O'Brien described these FBI procedures as "very complicated and redundant." (O'Brien Hr'g Test. at 60.) Officer O'Brien testified there were positive results to the NIBIN examination which compares shell casings to determine if a firearm would be tied to other shooting incidents. (*Id.* at 61.) These positive results created additional follow-up work for the investigation. (*Id.* at 63.) He also referenced the time it took to do a firearm trace summary to identify the original purchaser from a federally licensed firearms dealer, to obtain a nexus examination to determine if the firearm was manufactured outside of Iowa, to obtain a warrant for DNA, to photograph, swab and fingerprint the firearm, and bring a witness (the driver of the vehicle) before a grand jury. Officer O'Brien clarified that he is not required by FBI procedures to complete the nexus analysis, NIBIN search, and obtain DNA results prior to applying for a warrant but it was logical to do so. (*Id.* at 78.)

Officer O'Brien testified that he typically carries a caseload of 15 to 20 cases, with the highest priority being those with a violent offender on the street. (*Id.* at 64-65.) Defendant's case was a lower priority because he was in custody pending his revocation hearing, but he did not wait until February 8, 2024 to obtain a warrant merely because he believed there was no rush. (*Id.* at 65.) The Government also points out that Defendant was in custody based on violations of federal supervised release and the

supervised release matter included a contested evidentiary hearing that occurred on December 11, 2023 and was continued to January 17, 2024.

Based on the totality of the circumstances, I find that the delay was not "because law enforcement officers simply believed that there was no rush" or was "the result of complete abdication of [law enforcement's] work or failure to see any urgency." *Bragg*, 44 F.4th at 1073 (quotations omitted). Accordingly, on balance, I find that the 110-day delay was not unreasonable given the circumstances outlined above. *See United States v. Christie*, 717 F.3d 1156, 1163-64 (10th Cir. 2013) (finding a five-month delay in obtaining search warrant for seized computer not unreasonable); *United States v. Stabile*, 633 F.3d 219, 235-36 (3d Cir. 2011) (finding a three-month delay in obtaining search warrant for seized hard drives not unreasonable); *United States v. Jones*, No. 23-cr-10125-ADB, 2024 WL 4542929, at *4-*7 (D. Mass. Oct. 22, 2024) (finding four-month delay in obtaining search warrant for seized cell phone not unreasonable); *United States v. Ortega*, No. 21-CR-665 MV, 2023 WL 2712533, at *5 (D.N.M. Mar. 30, 2023) (finding nine-month delay in obtaining search warrant for seized cell phone not unreasonable); *United States v. Davis*, No. 18-cr-20085-02, 2021 WL 4192045 (E.D. Mich. Sept. 15, 2021) (finding 12-month delay in obtaining search warrant for seized cell phone not unreasonable).

### 5. *Whether there was an illegal search of the phone prior to the warrant*

To the extent that Defendant believes that law enforcement accessed his cell phone prior to the search warrant application, I find that Defendant's allegation lacks any evidence and is without merit. Officer O'Brien testified that prior to obtaining the search warrant he never had possession of the phone and never searched it, nor, to his knowledge, did anyone else. (O'Brien Hr'g Test. at 55.) Inv. Holst testified that he used GrayKey software and hardware to perform an extraction from Defendant's cell phone as shown in an extraction report. (Holst Hr'g Test. at 28; Ex. 10.) The extraction report

indicates that the date of extraction, February 13, 2024, was the first time the phone had been opened and accessed since it came into police custody. The device was successfully accessed; however, it was not able to be accessed by the GrayKey "Bruteforce" feature and it was not accessed using a passcode. Inv. Holst testified that because the phone is secured in the CRPD digital forensics lab, he would know if anyone had previously attempted to access the phone. He further testified that the cell phone came into his possession on October 23, 2023. (*Id.* at 43.) The cell phone remained on a charger so it would remain in the state as it was received. (*Id.* at 44.) The cell phone was released on July 17, 2024. (*Id.* at 43.) I find no evidence that Defendant's cell phone was accessed prior to law enforcement obtaining a search warrant.

Based on all of the foregoing, I find that there was no Fourth Amendment violation and recommend that the motion to suppress be denied.

### 6. *Whether* Leon *applies*

Alternatively, if the Court should disagree with me regarding whether law enforcement had probable cause to seize the cell phone and/or there was unreasonable delay in obtaining the search warrant for Defendant's phone, the *Leon* good faith exception is applicable to the search warrant for the cell phone. Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id*. at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id*. at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

47

While I have recommended the Court find the seizure of the phone and the delay in searching it to be in compliance with the Fourth Amendment, if the Court disagrees, it should nevertheless conclude the prewarrant conduct was close to the line of validity. As discussed above, the seizure of the phone was proper under *Smith* because by fleeing Defendant forfeited his expectation of privacy in the vehicle where the phone was seized as evidence of his possession of a firearm. Officers also had probable cause to seize the firearm and based on the inevitable discovery doctrine, the phone's seizure was inevitable. Furthermore, as the above discussion shows, the "line of validity" regarding how quickly law enforcement must search a cell phone is far from clear. Courts have varied widely, depending on the circumstances. Nothing about a 110-day delay strikes me as obviously beyond the line of validity.

None of the four scenarios contemplated by *Leon* apply here. Indeed, there is no allegation or evidence that the affidavit in support of the search warrant contained any false statements or that the issuing magistrate judge was misled in any way. There is no allegation or evidence that the issuing magistrate judge "wholly abandoned" their judicial role in issuing the search warrant. The probable cause outlined in the affidavit is consistent with the probable cause I found addressed above and therefore was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See Proell*, 485 F.3d at 431. Finally, there is no allegation or evidence that the warrant is "so facially deficient" that a police officer could not reasonably presume that the warrant was valid.

Moreover, as discussed above, I find that the seizure of Defendant's cell phone was legal, and law enforcement had probable cause to seize it. I also find that the delay in seizing the phone and obtaining the search warrant was not unreasonable. Nothing on this record shows that any of law enforcement's conduct related to the seizure of Defendant's phone and the time it took to obtain a search warrant was "clearly illegal."

48

Instead, the record shows that the seizure of the phone and obtaining the search warrant never strayed from, or far from, the line of validity. *See Cannon*, 127 F.3d at 413. Thus, I find that law enforcement's conduct was close enough to the line of validity to justify law enforcement's belief that the search warrant was objectively reasonable. *See id*. Accordingly, as an alternative, I recommend that Defendant's motion to suppress be denied under the *Leon* good faith exception.

## V.    THE MOTION TO DISMISS

### A.    The parties' arguments

Defendant argues that the charge against him should be dismissed due to unreasonable preindictment delay. (Doc. 26.) Defendant claims actual prejudice arising from delay and that the Government intentionally delayed the indictment to harass him or gain a tactical advantage. (*Id.* at 4-5.) The prejudice springs from Defendant's inability to prove his phone was accessed before the warrant was issued because his lawyers "no longer have adequate records to establish when the Government notified them of purported images of firearms being found on Defendant's phone." (*Id.* at 4.) Defendant seems to argue that the intent is shown by the Government's failure to file the charge until after he was sentenced to an above-guidelines revocation sentence arising from the possession of a firearm. (*Id.* at 5.) Defendant argues, "The Court's reason to go above the guideline was largely based upon its finding that the Defendant possessed a firearm. Said revocation was then used as proposed inducement to get the Defendant to enter a guilty plea." (*Id.*)

As with the motion to suppress, the Government argues that there had been no search of the phone prior to the issuance of the federal warrant (Ex. 6) and, therefore, Defendant cannot have been prejudiced by his inability to produce materials that might prove the illegal search. (Doc. 39 at 3.) The Government points out that it is strange that Defendant's attorneys would have lost or destroyed records before the deadline to

49

file a § 2255 petition has run.  (*Id.* at 4.)  Finally, the Government argues Defendant has not established intentional delay for a tactical advantage or to harass him and the reasons for the lapse of time between the offense and indictment are reasonable.  (*Id.* at 4-5.)

**B.     *Relevant law***

"The Due Process Clause of the Fifth Amendment protects a criminal defendant against unreasonable pre-indictment delay."  *United States v. Lewis*, 146 F.4th 621, 629 (8th Cir. 2025) (quoting *United States v. Sturdy*, 207 F.3d 448, 451–52 (8th Cir. 2000)).  However, "the interests of the suspect and society are better served if, absent bad faith or extreme prejudice to the defendant, the prosecutor is allowed sufficient time to weigh and sift evidence to ensure that an indictment is well founded."  *United States v. Jackson*, 446 F.3d 847, 849 (8th Cir. 2006) (quoting *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850)*, 461 U.S. 555, 563 (1983)).  To prove a violation of due process due to pre-indictment delay, a defendant "must establish that: (1) the delay resulted in actual and substantial prejudice to the presentation of the defense; and (2) the government intentionally delayed his indictment either to gain a tactical advantage or to harass him."  *Lewis*, 146 F.4th at 629 (quoting *Sturdy*, 207 F.3d at 452).  "Actual prejudice requires that 'a defendant must specifically identify witnesses or documents lost during delay properly attributable to the government.'"  *Id.* (quoting *Sturdy*, 207 F.3d at 452, in turn quoting *United States v. Bartlett*, 794 F.2d 1285, 1289 (8th Cir. 1986)).  "It is not sufficient for a defendant to make speculative or conclusory claims of possible prejudice as a result of the passage of time."  *Id.* (quotation omitted).  Thus, "a defendant must overcome a high hurdle when contending that a pre-indictment delay that does not violate the statute of limitations is violative of the due process clause."  *Jackson*, 446 F.3d at 849.

*C.*     *Application*

Defendant seeks dismissal of the indictment and argues that the Government unreasonably delayed the indictment in this matter.   To demonstrate that the delay resulted in actual and substantial prejudice, Defendant argues that "the Government was aware of what was on his cell phone prior to the application for and granting of a search warrant." (Doc. 26 at 4.)  Defendant maintains that "[b]ecause of the unnecessary delay caused by the Government, both counsel for the Defendant as well as other counsel he had retained no longer have adequate records to establish exactly when the Government first notified them of purported images of firearms being found on Defendant's cell phone.  (*Id*.)   Thus, Defendant has no evidence to support his allegation that the Government unlawfully accessed his cell phone prior to obtaining a search warrant.  As discussed above both Officer O'Brien and Inv. Holst testified that Defendant's phone was not accessed prior to law enforcement obtaining the search warrant.  (O'Brien Hr'g Test. at 55; Holst Hr'g Test. at 28, 43-44.)  Furthermore, the Government's correspondence, two emails, discussing photographs found on Defendant's phone are both dated after the search warrant was issued.  (Ex. 12.)

Defendant also argues, "The Court's reason to go above the guideline was largely based upon its finding that the Defendant possessed a firearm.  Said revocation was then used as proposed inducement to get the Defendant to enter a guilty plea." (Doc. 26 at 5.)  This argument is not well explained.  The Government appears to be responding to it when it states: "Moreover, prior to obtaining the search warrant, the government attempted to negotiate a global resolution of the supervised release violations and new law violations with Defendant."  (Doc. 36 at 23, Ex. 11.)  Exhibit 11 is a January 2, 2024 email between the Government and Mr. Johnson wherein the Government asks: "Did he ever decide if he wanted a pre-indictment offer from my office, or does he want me to just continue to investigate with a view towards potential new charges before his

51

release whenever that is?" Defendant has not established how the possibility of "global resolution" of the supervised release violation and the "new charge" prejudiced him in any way. He has not pleaded guilty to any charge. He was not, in fact, "induced" to do anything. He did not admit possession of the gun during the revocation proceedings. 19-cr-00034-CJW-MAR Document 117. Ultimately, he has not established how any of these assertions relate to the alleged pre-indictment delay.

Based on the foregoing, I find that Defendant has failed to meet "actual and substantial prejudice" requirement for pre-indictment delay because Defendant offers no evidence to support his allegation that the Government accessed his phone prior to obtaining a search warrant. *See Lewis*, 146 F.4th at 629 ("Actual prejudice requires that a defendant must specifically identify witnesses or documents lost during delay properly attributable to the government" and "[i]t is not sufficient for a defendant to make speculative or conclusory claims of possible prejudice as a result of the passage of time.") (Quotations omitted). Even if Defendant demonstrated actual and substantial prejudice—which he has not—Defendant cannot show that the Government intentionally delayed the indictment to gain a tactical advantage or to harass him because Defendant has not evidence, identified any tactical advantage gained by the Government or harassment by the Government. Thus, Defendant has failed to prove a violation of due process due to pre-indictment delay. *See Lewis*, 146 F.4th at 629. Accordingly, I recommend that the motion to dismiss be denied.

## VI. CONCLUSION

### A. Order

For the reasons set forth above, I sustain Defendant's objection to further cross-examination of him as requested by the Government.

***B.*** **Report and Recommendation**

I respectfully recommend the District Court **deny** Defendant's Motion to Suppress **(Doc. 25)** and **deny** Defendant's Motion to Dismiss **(Doc. 26)**.

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 20th day of October, 2025.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa